George Y. Erlandson v. Commissioner.
Erlandson v. Commissioner
Docket No. 65621.
United States Tax Court
T.C. Memo 1958-218; 1958 Tax Ct. Memo LEXIS 2; 17 T.C.M. (CCH) 1077; T.C.M. (RIA) 58218; December 31, 1958
*2 Petitioner received wages for his services aboard a ship owned by the United States and operated by a private shipping firm under a general agency contract. Held, the wages were paid by the United States or an agency thereof and thus they were not tax-exempt under section 911(a), I.R.C. of 1954. Robert W. Teskey, 30 T.C. 456, followed. Ralf H. Erlandson, Esq., 1935 Washington Street, Milwaukee, Ore., for the petitioner. Jack T. Fuller, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The Commissioner has determined a deficiency in the petitioner's income tax in the amount of $1,960.38 for the calendar year 1954. The *3 sole issue for determination is whether the petitioner is entitled to a partial exemption for the seaman's wages he earned while serving aboard an American ship operating between ports in Japan and Korea, under section 911(a)(2) of the Internal Revenue Code of 1954. Findings of Fact Most of the facts have been stipulated and are included herein by this reference. The petitioner, a citizen of the United States, filed his income tax return for the calendar year 1954 with the director of internal revenue for the district of Oregon. In January 1952, the petitioner signed shipping articles at Portland, Oregon, to serve as Second Officer aboard the M/V Jumper Hitch. At the trial of this case, respondent contested petitioner's claimed presence in a foreign country as prescribed by section 911(a)(2), Internal Revenue Code of 1954; however, respondent has now conceded this issue. We adopt respondent's language as our finding: "* * * the petitioner, during the 18 consecutive months immediately preceding April 10, 1954, was present in the territorial waters of a 'foreign country or countries during at least 510 full days' in that period *4 and received compensation for the services he performed abroad 'from sources without the United States.'" The United States of America owned the Jumper Hitch. Through and by the Director, National Shipping Authority of the Maritime Administration, Department of Commerce, the United States entered into a general agency agreement for the operation of the ship with Pacific Far East Line, Inc. This Service Agreement, dated April 6, 1951, was contract number MA-82-GAA, and in part provided the following: "THIS AGREEMENT, made as of April 6, 1951, between the UNITED STATES OF AMERICA (herein called the 'United States') acting by and through the Director, National Shipping Authority of the Maritime Administration, Department of Commerce, and, PACIFIC FAR EAST LINE, INC., a corporation organized and existing under the laws of Delaware, (herein called the 'General Agent'): "ARTICLE 1. APPOINTMENT OF GENERAL AGENT. The United States appoints the General Agent as its agent and not as an independent contractor, to manage and conduct the business of vessels assigned to it by the United States from time to time and accepted by the General Agent. "ARTICLE 2. ACCEPTANCE OF APPOINTMENT. The *5 General Agent accepts the appointment and undertakes and promises so to manage and conduct the business for the United States, in accordance with such directions, orders or regulations not inconsistent with this Agreement as the United States has prescribed, or from time to time may prescribe, and upon the terms and conditions herein provided, of such vessels as have been or may be by the United States assigned to and accepted by the General Agent for that purpose. "ARTICLE 3. DUTIES OF THE GENERAL AGENT. For the account of the United States, in accordance with such directions, orders, regulations, forms and methods of supervision and inspection as the United States may from time to time prescribe (or in the absence of such directions, orders, regulations, forms and methods of supervision and inspection, in accordance with reasonable commercial practices and/or the use of customary commercial forms), in an economical and efficient manner, and exercising due diligence to protect and safeguard the interests of the United States in connection with the duties prescribed in this Agreement and without prejudice to its rights under Article 6 hereof, the General Agent (solely as agent of *6 the United States and not in any other capacity) shall: * * *
"(b) Collect, deposit, remit, disburse and account for all monies due the United States arising in connection with activities under or pursuant to this Agreement, and to the extent disbursements made by the General Agent pursuant to this Agreement are recoverable from insurance, the General Agent shall take such steps as may be appropriate to effect such recovery for the account of the United States. * * *
"(d) Procure the Master of the vessels operated hereunder, subject to the approval of the United States. The Master shall be an agent and employee of the United States, and shall have and exercise full control, responsibility and authority with respect to the manning, navigation and management of the vessel. The General Agent shall procure and make available to the Master for engagement by him the officers and men required by him to fill the complement of the vessel. Such officers and men shall be procured by the General Agent through the usual channels and in accordance with the customary practices of commercial operators and upon the terms and conditions of the General Agent's collective bargaining agreements, *7 if any. The officers and members of the crew shall be subject only to the orders of the Master. All such persons shall be paid in the customary manner with funds provided by the United States hereunder. * * *
"(f) Furnish and maintain during the period that any vessel is assigned and accepted by the General Agent under this Agreement, at its own expense, a bond with sufficient surety in such amount as the United States shall determine such bond to be approved by the United States as to both sufficiency of surety or sureties and form, and to be conditioned upon the due and faithful performance of all and singular the covenants and agreements of the General Agent contained in this Agreement, including without limitation of the foregoing the condition faithfully to account to the United States for all funds collected and disbursed and funds and property received by the General Agent or its sub-agent. The General Agent may, in lieu of furnishing such bond, pledge direct or fully guaranteed obligations of the United States of the cash value of the penalty of the bond under an agreement satisfactory in form to the United States. "No monies or slop chest property of the United States *8 shall be advanced or entrusted by the General Agent to a Master, purser or any other member of the ship's personnel unless such person is under a bond indemnifying the United States against loss of such monies or property caused solely or in part by the dishonesty or lack of care of any such person in the performance of the duties of any position covered by the bond. "(g)(1) Keep books, records and accounts (which shall be the property of the United States) relating to the activities, maintenance and business of the vessels covered by this Agreement in such form and under such regulations as may be prescribed by the United States; * * *" There is an addendum dated October 5, 1951, to the above agreement providing, in part, the following: "ARTICLE 5. DISBURSEMENTS. "* * * The United States shall also advance funds to the General Agent to provide for, and the General Agent shall receive credit for, all crew expenditures accruing during the term hereof in connection with the vessels assigned hereunder, including, without limitation, expenditures on account of wages, extra compensation, overtime, bonuses, penalties, subsistence, repatriation, internment, travel, loss of personal *9 effects, maintenance and cure, vacation allowances, damages or compensation for death or personal injury or illness, insurance premiums, Social Security taxes, state unemployment insurance taxes and contributions made by the General Agent to a pension or welfare fund with respect to the period of this Agreement and in accordance with a pension or welfare plan in effect on the effective date of this Agreement or which, pursuant to collective bargaining agreements, may become effective during the period of this Agreement with respect to the officers and members of the crew of said vessels who are or may become entitled to benefits under such plan, or any other payment required by law." It has been orally stipulated that the United States provided the general agent with funds for the wage payments due the officers and crew of the Jumper Hitch from the Civil Operations Revolving Fund created by Congress in 1951. (65 Stat. 59) In April 1954, the petitioner was paid $10,299.97 by the United States Government's general agent, Pacific Far East Line, Inc., for his services performed aboard the Jumper Hitch. The petitioner was so paid by the United States or an agency thereof. Opinion
*10 The only remaining question for decision is whether the petitioner was paid by the United States or an agency thereof, for, if he was paid by either, he will not receive the exemption benefit of section 911(a)(2). [1]
The recent case of Robert W. Teskey, 30 T.C. 456, involved the same issue, with facts almost identical to those present here, and we there held that the seaman involved in that case was paid by the United States or an agency thereof. The petitioner *11 admits that the Teskey case is in point, but requests that we overrule it. We have again carefully considered the issue and find no reason to depart from our prior position. Thus, the petitioner was paid by the United States or any agency thereof and his wages are not exempt from taxation under section 911(a)(2). Decision will be entered for the respondent. Footnotes
1. SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES. (a) General Rule. - The following items shall not be included in gross income and shall be exempt from taxation under this subtitle: * * *
(2) Presence in Foreign Country for 17 Months. - In the case of an individual citizen of the United States, who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or an agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period; * * * [Italics supplied.]↩